IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| A.P.*, a minor child, by and through her father and legal guardian*, JOSHUA PORTER, <br><br> Plaintiff, <br><br> v. <br><br> RUSSEL CARLSON, *in his official capacity as Commissioner of the Georgia Department of Community Health*, <br><br> Defendant. | CIVIL ACTION FILE NO. |

## VERIFIED COMPLAINT

Pursuant to 42 U.S.C. §1983, Plaintiff A.P., by and through her father and legal guardian, Joshua Porter, hereby files this Verified Complaint against Defendant Russel Carlson, in his official capacity as Commissioner of the Georgia Department of Community Health, for declaratory and injunctive relief to redress Defendant's violations of the Plaintiff's rights under the Medicaid Act, 42 U.S.C. §1396 *et. seq.*, and the Fourteenth Amendment.

1

## I.   INTRODUCTION

1.      This is an action to enjoin Defendant from failing to fulfill his duty to A.P., a twenty-one-month-old Medicaid recipient, to provide the private duty nursing services under the Georgia Pediatric Program ("GAPP") necessary to ameliorate her complex conditions and maintain her health and wellbeing.

2.      Defendant Carlson administers GAPP under the Georgia Medicaid program to provide in-home private duty nursing services to medically complex Medicaid-eligible children and youth under the age of 21.

3.      Following a hospitalization in January 2023, A.P. was authorized by her private insurance to receive approximately 50-60 hours per week of private duty nursing services through April 2023.

4.      Once the private insurance coverage was exhausted, A.P.'s parents applied to receive 40 hours per week of private duty nursing services through GAPP in late May 2023.

5.      In a letter dated July 14, 2023, Defendant notified A.P.'s parents that A.P. was authorized to receive 8 hours per week of private duty nursing services. The letter failed to state the specific action being taken – a denial of the request for 40 hours per week of private duty nursing services, the specific reasons for the denial, or when the 8 hours of nursing would begin or end.

6.      In late June 2023, A.P. began experiencing increased episodes of prolonged seizure activity requiring the administration of oxygen and rescue medications.

7.      In a letter dated September 22, 2023, A.P.'s treating physician recommended she receive 50 hours per week of private duty nursing services to meet her skilled care needs particularly related to her increased seizure activity.

8.      In a letter dated October 5, 2023, Defendant notified A.P.'s parents that A.P. was authorized to receive 21 hours per week of private duty nursing services. The letter failed to state the specific action being taken – a denial of the request for 50 hours per week of private duty nursing services, the specific reasons for the denial of the 50 hours per week of private duty nursing services, or when the 21 hours of nursing would begin or end.

9.      On October 30, 2023, Plaintiff's counsel requested Defendant reconsider his decision to deny A.P. the 50 hours per week of private duty nursing hours recommended by her treating physician.

10.     On November 1, 2023, Defendant's counsel communicated that Defendant would maintain Plaintiff at 21 hours per week.

11.     The Early and Periodic Screening, Diagnostic, and Treatment Services ("EPSDT") provisions of the Medicaid Act require Defendant to provide

3

Medicaid-eligible children and youth such as A.P. with all necessary healthcare,

diagnostic services, treatment, and other measures described in 42 U.S.C.

§1396d(a) to "correct or ameliorate" their illnesses and conditions. 42 U.S.C. §§

1396a(a)(43), 1396d(a)(4)(B), & 1396d(r)(5). This includes private duty nursing

services. *See* 42 U.S.C. §1396d(a)(8); *see also Moore ex rel. Moore v. Reese*, 637

F.3d 1220, 1224 (11th Cir. 2011).

12.    The Medicaid Act and the Fourteenth Amendment of the U.S.

Constitution also require Defendant to provide A.P. with timely and adequate

written notice when he is denying or reducing A.P.'s Medicaid services. 42 U.S.C.

§1396a(a)(3); 42 C.F.R. §§431.206, 431.210; *Goldberg v. Kelly*, 397 U.S. 254

(1970). This written notice must include, among other requirements, a clear

statement of what action the state intends to take and the specific reasons for the

intended action including the legal and factual bases for the decision. 42 C.F.R. §

431.210(a)&(b); *Goldberg,* 397 U.S. at 267-68.

13.    A.P., as a Georgia Medicaid recipient under the age of 21, is entitled

to the prompt provision of EPSDT services, specifically medically necessary

private duty nursing services, to ameliorate her complex conditions.

4

14. Defendant fails to meet his obligations under the Medicaid Act and the Fourteenth Amendment by employing a flawed process to assess A.P.'s conditions and care needs and authorize private duty nursing hours, specifically:

- Defendant disregards the role of A.P.'s treating physician in determining what treatment is necessary to ameliorate A.P.'s conditions;

- Defendant fails to apply EPSDT's "ameliorate" criterion of medical necessity to A.P.'s requests for private duty nursing services;

- Instead, Defendant "scores" some of A.P.'s skilled nursing tasks using a scoring tool created by the contractor that reviews requests for private duty nursing services under GAPP. The tool has not been subjected to any scientific testing to demonstrate its accuracy, relevancy, or validity in determining the amount of skilled nursing hours necessary to ameliorate the conditions of each individual GAPP participant;

- Defendant assumes A.P.'s parent caregivers are capable of substituting for the care of licensed nurses and, in performing A.P.'s care, are able to exercise the complex observations and critical decisions that require the knowledge and skills of a licensed nurse;

5

- Defendant assumes A.P.'s parent caregivers are capable of providing one hundred and forty-seven (147) hours per week (21 hours per day) of skilled care to her without any assessment of their availability (i.e., the need to sleep, work, or care for themselves, or their household) or their physical or mental capacity to do so; and,

- Defendant's written notices of the reduction and denial of A.P.'s private duty nursing services fail to provide A.P. or her parents with notice of the specific action being taken, the specific reasons for the denial of private duty nursing, or when the authorized hours would begin and end.

15.   Defendant's flawed process for authorizing private duty nursing services has resulted in A.P. being approved for an amount of private duty nursing services that is insufficient in "amount, duration, and scope to reasonably achieve" the ameliorative purpose of EPSDT.

16.   Defendant's flawed process has also left A.P. without a specific explanation of why her private duty nursing hours are being denied.

17.   Defendant's unlawful acts and omissions have and will continue to irreparably harm A.P. by denying her medically necessary private duty nursing services to ameliorate her conditions and by denying her adequate written notice of

6

Defendant's decision and the reasons for the decision to deny her private duty nursing services.

18. A.P. seeks declaratory and injunctive relief to promptly redress Defendant's violation of her rights under the Medicaid Act and the Fourteenth Amendment.

## II.  JURISDICTION AND VENUE

19. This civil action is authorized by 42 U.S.C. § 1983 to redress the deprivation under color of law of rights guaranteed by the Medicaid Act and the U.S. Constitution. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

20. This Court has authority to grant A.P.'s claims for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

21. Venue is proper in the United States District Court for the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b), since all of the acts and omissions giving rise to these claims occurred in the Northern District of Georgia.

## III.  PARTIES

22.     A.P. resides in Atlanta, Georgia with her family. She is a Georgia Medicaid beneficiary under the age of 21, and brings this action by and through Joshua Porter, her father and legal guardian.

23.     Defendant Russel Carlson is the Commissioner of the Georgia Department of Community Health ("DCH").  He is the chief administrative officer of DCH and supervises, directs, accounts for, organizes, plans, administers, and executes the functions vested in DCH. O.C.G.A. §§31-2-6; 49-4-144.  Defendant Carlson is responsible for ensuring that the administration and operation of the Georgia Medicaid Program, including GAPP, fully complies with federal and state laws including the Medicaid Act and its implementing regulations.  He is sued in his official capacity for declaratory and injunctive relief.  He was acting and continues to act under color of state law during the relevant acts and omissions alleged herein.

24.     Defendants' business office is located at 2 Martin Luther King Jr. Drive SE, East Tower, Atlanta, GA 30334.

## IV.   LEGAL FRAMEWORK

### The Medicaid Act

25. The Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396w-5, establishes a medical assistance program cooperatively funded by the federal and state governments.

26. Medicaid is designed to "enabl[e] each State, as far as practicable...to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence and self-care...." 42 U.S.C. § 1396-1.

27. The Medicaid Act defines "medical assistance" as the categories of care and services listed at 42 U.S.C. §1396d(a) or the payment of part or all the cost of such care and services. 42 U.S.C. § 1396d(a).

28. States are required to furnish medical assistance "with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8).

29. States must provide for making medical assistance available to all individuals who are eligible. 42 U.S.C. § 1396a(a)(10)(A).

30. A state's Medicaid program must "include reasonable standards. . . for determining eligibility for and the extent of medical assistance under the plan

9

which . . . are consistent with the objectives" of the Medicaid Act. 42 U.S.C. § 1396a(a)(17).

31.     States are required to administer Medicaid in "the best interests of recipients." 42 U.S.C. § 1396a(a)(19).

32.     The Centers for Medicare & Medicaid Services (CMS) of the United States Department of Health and Human Services administers Medicaid at the federal level. CMS's rules and regulations are set forth in 42 C.F.R. §§ 430.0-456.725 and in the CMS State Medicaid Manual.

33.     A state's participation in Medicaid is voluntary. Once a state elects to participate, it must adhere to the requirements established by the United States Constitution, the Medicaid Act, and the rules promulgated by CMS. 42 U.S.C. § 1396-1; 42 C.F.R. § 430.12.

34.     Defendants' Medicaid program must "provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." 42 U.S.C. § 1396a(a)(19); *see also* 42 C.F.R. § 435.902.

35.     Defendants must "[f]urnish Medicaid promptly to beneficiaries without any delay caused by the agency's administrative procedures," and must

"[c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible." 42 C.F.R. §435.930(a)-(b).

## The EPSDT Mandate

36.    The Medicaid Act requires state Medicaid programs to provide "early and periodic screening, diagnostic and treatment services" ("EPSDT") to Medicaid-eligible children under age 21. *See* 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43), 1396d(a)(4)(B), and 1396d(r).

37.    CMS describes EPSDT as follows:

> The EPSDT benefit is more robust than the Medicaid benefit for adults and is designed to assure that children receive early detection and care, so that health problems are averted or diagnosed and treated as early as possible. The goal of EPSDT is to assure that individual children get the health care they need when they need it – the right care to the right child at the right time in the right setting.

U.S. Dep't of Health & Human Servs., Ctrs. for Medicare & Medicaid Servs. (CMS), *EPSDT: A Guide for States: Coverage in the Medicaid Benefit for Children and Adolescents* at 1 (June 2014) ("CMS EPSDT Guide").[1]

---

[1] The CMS EPSDT Guide can be accessed at:
https://www.medicaid.gov/sites/default/files/2019-12/epsdt_coverage_guide.pdf.

38.     Under the EPSDT provisions, Medicaid eligible children must receive all services and treatments covered by the Medicaid Act that are necessary to "correct or ameliorate" any physical and mental illnesses and conditions discovered during a screening by a healthcare clinician. 42 U.S.C. § 1396d(r)(5); *see also Moore*, 637 F.3d at 1235.

39.     Private duty nursing services are included in the treatments and services under the Medicaid Act. *See* 42 U.S.C. § 1396d(a)(8).

40.     The Medicaid Act defines private duty nursing services as "nursing services for beneficiaries who require more individual and continuous care than is available from a visiting nurse or routinely provided by the nursing staff of the hospital or skilled nursing facility." 42 C.F.R. §440.80. These services are provided by "a registered nurse or a licensed practical nurse" and must be "[u]nder the direction of the beneficiary's physician." *Id*.

41.     A service will "correct or ameliorate" the child's condition if it corrects, compensates for, improves a condition, or prevents a condition from worsening, even if the condition cannot be prevented or cured. *CMS EPSDT Guide* at 10.

42.     CMS "defines ameliorative services as those 'that *maintain* or improve [a] child's current condition.' These services 'are covered when they

12

*prevent a condition from worsening* or prevent development of additional health problems.'" *C.R. v. Noggle*, 559 F.Supp.3d 1323, 1336 (N.D. Ga. 2021) (quoting the *CMS EPSDT Guide* at 10) (emphasis in original).

43.     While states are "permitted (but not required) to set parameters that apply to the determination of medical necessity in individual cases…those parameters may not contradict or be more restrictive than the federal [EPSDT] statutory requirement." *CMS EPSDT Guide* at 23.

44.     For example, a state "may cover services in the most cost effective mode," but the state must ensure that "the less expensive service is *equally effective* and actually available." *Id.* at 25 (emphasis added).

45.     Furthermore, "a state may not deny medically necessary treatment to a child based on cost alone" and "[t]he child's quality of life must also be considered." *Id.*

46.     EPSDT defines the role of the treating physician as the "screening service" who takes "a comprehensive health and developmental history," performs "a comprehensive unclothed physical exam," and performs "laboratory tests" "to determine the existence of certain physical or mental illnesses or conditions." 42 U.S.C. § 1396d(r)(1)(A)&(B).

47.     EPSDT requires the provision of all necessary care "to correct or ameliorate" any conditions detected by the screening service. 42 U.S.C. § 1396d(r)(5).

48.     The amount of EPSDT services authorized by the state must be sufficient in amount, duration, and scope to reasonably achieve the purpose of the service to correct or ameliorate a child's condition. *See Moore*, 637 F.3d at 1257-8.

49.     The treating physician is "a key figure" and initially determines the amount of private duty nursing services necessary for the child. *Moore*, 637 F.3d at 1257.

50.     The state must consider and give weight to the opinions of a beneficiary's treating physician. Both the treating physician and the state have a role to play in evaluating whether a service is necessary to correct or ameliorate a child's condition. *Id.* at 24. The state cannot dismiss the treating physician's recommendation without consideration and, where there is a disagreement, must decide, based on the evidence, whether the service should be covered. *Id.*

51.     The state is not the "final arbiter" of medical necessity and cannot ignore the treating physician's recommendation of nursing hours. *Moore*, at 1258-59.

52.    The Medicaid Act does not permit the state to delegate medically necessary private duty nursing services to unlicensed caregivers.

53.    Under EPSDT, the determination of the amount of private duty nursing services by licensed nurses necessary to correct or ameliorate a child's conditions is based upon the demonstrated healthcare needs of the child identified by the screening service (i.e., the treating physician).

54.    EPSDT does not authorize or permit the determination to be made based upon whether unskilled, unlicensed caregivers have been trained to provide certain nursing interventions.

**Due Process under the Fourteenth Amendment and the Medicaid Act**

55.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution prohibits Defendant from depriving a person of life, liberty, or property without due process of law. U.S. Const. amend. XIV, §1.

56.    Medicaid beneficiaries have a protectable "property interest" in their Medicaid benefits under the Due Process Clause. *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970) (holding when public welfare benefits are terminated, due process requires notice and an opportunity to be heard).

57.    The Due Process Clause requires Defendant to inform a Medicaid beneficiary of an adverse action by a "timely and adequate notice detailing the

reasons for" a proposed action. *Id.* In order to be effective, such notice must include both the legal and factual bases underlying the decision. *See id.* at 268 (noting that "recipients have challenged proposed terminations as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases").

58.    The Medicaid Act requires Defendant's Medicaid program to provide "an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the [State] plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3).

59.    The federal regulations implementing 42 U.S.C. § 1396a(a)(3) specifically incorporate the due process standards of *Goldberg v. Kelly*, 397 U.S. 254 (1970). 42 C.F.R. § 431.205(d).

60.    The fair hearing regulations require Defendant to issue a written notice to every beneficiary whenever the agency takes any action affecting an individual's eligibility, benefits, or services. 42 C.F.R. §§ 431.206(b) & (c)(2).

61.    Defendant "must provide all applicants and beneficiaries with timely and adequate written notice of any decision affecting their eligibility, including an approval, denial, termination or suspension of eligibility, or a denial or change in benefits and services." 42 C.F.R. § 435.917(a).

16

62.     The written notice must include (1) a statement of what action the state intends to take; (2) a clear statement of the specific reasons supporting the intended action; (3) the specific regulations that support, or the change in federal or state law that requires, the action; (4) an explanation of the individual's right to request an evidentiary hearing; and (5) an explanation of the circumstances under which Medicaid is continued if a hearing is requested. 42 C.F.R. § 431.210.

## V.    STATEMENT OF FACTS

### The Georgia Medicaid Program

63.     The State of Georgia participates in the Medicaid program.

64.     DCH is the single state agency responsible for administering the Georgia Medicaid Program and for complying with the Medicaid Act. See 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10; O.C.G.A. § 49–4–142.

65.     To participate in the Medicaid program, a state must have a plan for medical assistance approved by Centers for Medicare and Medicaid Services ("CMS"). *See* 42 U.S.C. § 1396a(b).  DCH administers the Georgia Medicaid Program pursuant to the Georgia State Medicaid Plan (hereinafter "State Plan").

### The Georgia Pediatric Program

66.     DCH created GAPP as its service-delivery model under the Georgia Medicaid program for providing in home private duty nursing services to

17

medically complex children under 21 years of age with multiple systems diagnoses.

67.   Defendant Carlson is responsible for the administration and operation of GAPP.

68.   Defendant Carlson is also responsible for ensuring that the administrative methods that DCH employs to operate GAPP comply with applicable federal laws including the Medicaid Act and the U.S. Constitution.

69.   Defendant Carlson likewise is responsible for implementing DCH's fair hearing process; and as such is responsible for ensuring that GAPP participants receive timely and adequate written notice when GAPP services are denied, terminated, or reduced.

70.   Defendant issues, and updates quarterly, a policy manual entitled "Part II Policies and Procedures for Georgia Pediatric Program Services (GAPP) In-Home Nursing" (hereinafter "GAPP Manual"), that governs the administration of GAPP.  The current GAPP Manual is dated October 1, 2023.

71.   From its inception in 2002, GAPP has been a "teach and wean" program, meaning that family caregivers are taught to perform the skilled nursing tasks needed by their child and then the number of nursing hours approved for a GAPP participant are subsequently weaned down over time, with the family

18

caregiver expected to provide the requisite hours of nursing care that have been reduced without regard for the child's actual nursing needs.

72. When a child enters GAPP, an initial number of skilled nursing hours to be authorized is established for the child, and then the authorized nursing hours are reduced over a period of time as the family caregiver is presumed to be sufficiently trained in the performance of certain skilled nursing interventions.

73. Even though DCH has removed the express "teach and wean" language from the GAPP manual, GAPP remains a "teach and wean" program in practice. The longer a child participates in GAPP, the likelihood increases that the number of private duty nursing hours will be weaned as the family caregiver is taught to perform certain skilled nursing tasks for the child.

74. Some of the factors considered in determining whether to wean nursing hours are how long the participant has been in GAPP and whether the participant has been medically stable, i.e., exhibits no new skilled care needs or no recent hospitalizations.

75. Reductions of skilled nursing hours under the "teach and wean" policy are made without any consideration of the family caregiver's capacity to provide care.

76. In determining the number of nursing hours to be authorized for a GAPP participant, GAPP policy does not permit the consideration of "social factors" that may limit a family caregiver's ability to provide care for a GAPP participant, such as employment, other children or dependents to care for, functional limitations or physical impairments, sleep, maintaining a household, etc.

77. GAPP assumes the delegation of skilled nursing tasks to family caregivers is appropriate once a family caregiver has been taught by the child's nursing agency to perform the skilled nursing tasks in the child's plan of care.

78. GAPP policy does not permit an increase in authorized nursing hours unless a new skilled nursing intervention is demonstrated.

79. DCH has delegated the task of reviewing and deciding whether to approve or deny all requests for private duty nursing services under GAPP to a contractor, Alliant Health Solutions, Inc. ("Alliant").

80. Alliant applies the policies and procedures of the GAPP Manual when it reviews requests for prior authorization for private duty nursing services.

81. The GAPP Manual specifies the information and documentation that must be submitted in support of a request for private duty nursing services.

82. The child's GAPP nursing provider collects and submits the required information and documentation which includes a request for a specific number of nursing hours per week recommended by a treating physician.

83. Alliant employs a "medical review team" to review requests for nursing services under GAPP. The team usually consists of two or three nurses and one or two physicians who meet to review requests for nursing services. Only one of the physicians attends a team meeting.

84. An initial review of the GAPP packet submitted by the child's nursing agency is conducted by a review nurse. Typically, the review nurse is the only team member to review the treating physician's recommendation and other medical records.

85. The review nurse uses a scoring tool called the "Georgia Pediatric Program (GAPP) Evaluation Score Guidelines" (hereinafter "GAPP Score Guidelines") to determine the amount of skilled nursing hours to be authorized for each child reviewed.

86. The GAPP Score Guidelines were created by Alliant. They have never been subjected to any scientific review to determine their accuracy, reliability, or validity as a tool to measure or determine the amount of skilled nursing services to

ameliorate the multiple conditions of medically complex children who participate in GAPP.

87.     The GAPP Score Guidelines form is primarily comprised of a list of various skilled nursing interventions. Each skilled nursing intervention listed has a point value assigned to it.

88.     The GAPP Score Guidelines form contains a small box for entry of a primary diagnosis. There is no space on the form for other diagnoses.

89.     The review nurse identifies skilled nursing interventions for the child being reviewed and places a check by a box corresponding to the skilled nursing intervention.

90.     Once the review nurse has finished scoring the child's skilled nursing interventions, the points for each of the checked boxes are totaled.

91.     The review nurse then applies the Scoring Guidelines listed on the form to the total number of points to determine the range of nursing hours to be authorized. Upon information and belief, the following are the Scoring Guidelines used by Alliant:

- 1-6 points: Individual consideration
- 7-12 points: 2-8 hours/day, 14-56 hours/week
- 13-18 points: 6-12 hours/day, 42-84 hours/week

22

- \>19 points: Individual consideration

92.     From within the range of nursing hours indicated by the score, the review nurse then decides on the number of nursing hours to be recommended to the GAPP "medical review team."

93.     The treating physician's recommendation of nursing hours is not included on the GAPP Score Guidelines form.

94.     The number of hours recommended by the review nurse is also not included on the GAPP Score Guidelines form.

95.     The review nurse then meets with the GAPP "medical review team" comprised of a physician and one or two additional nurses and provides the team with an oral summary of the GAPP Score Guidelines for the child and provides a recommendation of the number of private duty nursing hours for the child.

96.     The GAPP "medical review team" members are not provided a copy of, and do not review, the packet of medical information submitted by the child's nursing agency or a copy of the GAPP Score Guidelines prepared by the review nurse.

97.     The sole physician participating in the "medical review team" meeting normally participates by telephone.

98.     The GAPP "medical review team" discusses the reviewing nurse's verbal summary of the GAPP Score Guidelines and the recommended number of nursing hours and then determines the number of nursing hours to be authorized under GAPP.

99.     The GAPP "medical review team" typically adopts the recommendation of the review nurse as the nursing hours medically necessary for the GAPP participant.

100.    The review nurse then prepares and uploads text regarding the decision of the "medical review team" which is inserted into a template notice letter that is sent to the child's parents.

101.    The notice letters produced by Alliant do not state the specific reasons for the decision of the "medical review team" and do not address or respond to the treating physician's recommendation.

102.    The notice letters produced by Alliant do not state the specific reasons why the nursing hours requested by the treating physician are not necessary to "correct or ameliorate" the child's conditions.

103.    Alliant's process for determining the number of hours of nursing to be authorized for children who participate in GAPP is not based upon, nor does it apply, the ameliorate criterion required by EPSDT.

24

104.    Alliant medical review team members review requests for skilled nursing services with the assumption that all family caregivers are capable of being trained to perform all skilled nursing tasks, except for a skilled nursing head-to-toe assessment.

105.    Alliant medical review team members review requests for skilled nursing services with the assumption that family caregivers are ready, willing, and able to provide the hours of care per day not authorized by GAPP.

### A.P.'s Condition and Care Needs

106.    A.P. has many serious, chronic conditions, including H3-3A associated genetic disorder, focal epilepsy, global developmental delay, cortical visual impairment, airway clearance impairment, infantile cerebral palsy, and hypotonia. She requires ongoing skilled nursing assessments and interventions related to her seizure disorder, respiratory status, and risk of aspiration.

107.    A.P. must be carefully monitored and observed for seizures 24 hours per day. Her seizures are random and occur at different times of the day including overnight. They are exacerbated by illness. Her seizures impact her daily life and require around the clock supervision, daily medications, and emergent interventions.

108.   A.P. is administered the medications Trileptal and Onfi twice per day to control her seizures. She also sometimes requires immediate intervention with additional medications to arrest her seizures. She is prescribed Diastat and Valium to be administered according to the judgment of her caregivers when she has a prolonged seizure lasting longer than 5 minutes or a cluster of seizures. Despite these interventions, A.P. continues to regularly have seizures.

109.   A.P.'s respiratory status must be closely monitored while she is having seizures for risk of aspiration and impaired clearance of her airway. She is at high risk of aspiration during a seizure, which could lead to respiratory distress and pneumonia. She must have a skilled caregiver who can identify when she is having a seizure and can intervene appropriately as necessary.

110.   A.P.'s oxygen saturation levels must be regularly monitored by her caregivers. Her respiratory status is monitored via a pulse oximeter when she is sleeping. She requires the administration of supplemental oxygen as needed during seizure activity when her oxygen saturation drops below 93%. She must also have her oral secretions suctioned as needed to keep her airway clear.

111.   A.P. began experiencing an increased number of prolonged seizures, 2-4 minutes in length, for an approximately two-week period beginning on June 27, 2023. During this time, she had an emergency room visit on June 28, 2023,

because of uncontrolled seizures and was administered Diastat. On July 7, 2023, she had another seizure that lasted longer than 5 minutes that required the administration of oxygen and Diastat.

112. A.P. had another two-week period of an increased number of prolonged seizures beginning on August 6, 2023, and then again on September 11, 2023. During these periods she was having 3-6 prolonged seizures per day, and she had to be administered supplemental oxygen. She has also often been administered Valium during these seizures.

113. A.P. receives daily respiratory interventions. She receives Singulair once per day to control and prevent wheezing and shortness of breath. She also receives Flonase to reduce nasal congestion. She must be orally suctioned as needed to keep her airway clear.

114. The 8 hours per week of nursing approved by Georgia Medicaid does not meet A.P.'s nursing needs, particularly during these increased periods of prolonged seizures.

115. A.P.'s nursing agency staffs the 8 hours per week as one eight-hour shift during the week. The rest of the week of care is managed by her parents who are her primary caregivers.

116. A.P.'s parents are trained in many aspects of her care. However, they are not trained and licensed nurses. They cannot provide A.P. with the assessment or critical decision-making of a licensed nurse that her multiple conditions require on a daily basis.

117. Both of A.P.'s parents work full-time and cannot care for her during the workday. A.P.'s mother has taken substantial leave time from work to care for A.P.

118. A.P.'s care needs are continuous. She cannot be left alone and requires the continuous presence of a caregiver capable of responding to her complex needs particularly when she is having a seizure.

119. Because they cannot care for her while they work, A.P.'s parents have placed her in a daycare where a specific daycare worker, who is not a nurse, is monitoring her seizure activity and respiratory status and providing care including the administration of seizure medications and oxygen.

120. This arrangement with the daycare is unsafe because the daycare worker is not a licensed nurse and does not have the training or licensure to provide A.P. the skilled care she needs. It also unnecessarily places A.P. at risk of adverse health outcomes such as prolonged, uncontrolled seizures, aspiration, and respiratory failure – all of which may result in hospitalization and possibly death.

28

121.   When her parents are unavailable to provide care, it is critically important to A.P.'s health and wellbeing that she remain in the regular and continuous care of licensed skilled nurses to provide ongoing assessments and interventions related to her seizure disorder, respiratory status, and risk of aspiration.

**A.P.'s Request for Private Duty Nursing Services**

122.   Following a hospitalization in January 2023, A.P. was authorized by her private insurance to receive approximately 50-60 hours per week of private duty nursing services through April 2023.

123.   Once her private insurance benefits were exhausted, A.P. as a Medicaid beneficiary could request coverage of her private duty nursing services through Medicaid.

124.   In late May 2023, A.P.'s nursing provider, Advanced Care Partners, submitted documentation on A.P.'s behalf requesting the authorization for 40 hours per week of private duty nursing services under GAPP.

125.   In a letter dated July 14, 2023, Alliant informed A.P.'s parents that it had determined that A.P.'s medically necessary skilled nursing hours were 8 hours per week.

126.   Under the heading "REVIEWER COMMENTS AND RATIONALE FOR THIS DECISION," the Alliant Notice letter stated the following:

> Hours are awarded based on the current medically necessary needs as documented within the GAPP packet for the current review period submitted by ADVANCED CARE PARTNERS LLC. [A.P.] requires seizure monitoring and medication administration. The hours allotted should meet HER needs.

127.   The Alliant notice letter dated July 14, 2023, fails to provide sufficient notice to A.P. or her parents regarding its actions or decision. The letter does not state that it is denying A.P.'s request for 40 hours per week of private duty nursing services. It does not provide any reasons for the denial of A.P.'s request for nursing hours. It fails to explain why or how Alliant determined that 8 hours per week of skilled nursing was sufficient to ameliorate A.P.'s complex conditions. It also does not state when the reduction would begin or end.

128.   Beginning on June 27, 2023, A.P. experienced a two-week period of an increased number of prolonged seizures, 2-4 minutes in length. During this time, she had an emergency room visit on June 28, 2023, because of uncontrolled seizures and was administered Diastat. On July 7, 2023, she had another seizure that lasted longer than 5 minutes that required the administration of oxygen and Diastat.

129. She had another two-week period of an increased number of prolonged seizures beginning on August 6, 2023, and then again on September 11, 2023. During these periods she was having 3-6 prolonged seizures per day, and she had to be administered supplemental oxygen. She has also often been administered Valium during these seizures.

130. In a letter dated September 22, 2023, A.P.'s treating physician requested an increase in A.P.'s nursing hours to 50 hours per week to address her skilled care needs while her parents are working.

131. In a letter dated October 5, 2023, Alliant informed A.P.'s parents that it had determined that A.P.'s medically necessary skilled nursing hours were 21 hours per week.

132. Under the heading "REVIEWER COMMENTS AND RATIONALE FOR THIS DECISION," the Alliant Notice letter stated the following:

> At this time, based on the additional documentation submitted by ADVANCED CARE PARTNERS LLC via change request, 21 hours/week skilled nursing services are medically necessary based on [A.P.]'s seizure frequency and to provide educational reinforcement for parents/caregivers for seizure management. Hours are awarded based on the current medically necessary needs as documented within the GAPP packet for the review period submitted. [A.P.] requires seizure monitoring and medication administration. The hours allotted should meet her needs.

133.    The Alliant notice letter dated October 5, 2023, fails to provide sufficient notice to A.P. or her parents of its actions or decision. The letter does not state that it is denying the request to increase A.P.'s nursing hours. It does not provide any reasons for the denial of A.P.'s nursing hours. It fails to explain why or how Alliant determined that 21 hours per week of skilled nursing was sufficient to ameliorate A.P.'s complex conditions. It also does not state when the 21 hours authorized would begin or end.

134.    On October 30, 2023, Plaintiff's counsel requested Defendant reconsider his decision to deny the 50 hours per week of private duty nursing services determined by Plaintiff's treating physician to be necessary to ameliorate Plaintiff's conditions.

135.    On November 1, 2023, Defendant's counsel communicated that Defendant would not agree to increase A.P.'s nursing hours and would maintain her at 21 hours per week.

136.    Defendant's failure to provide the 50 hours per week of private duty nursing services as recommended by A.P.'s treating physician places her at risk of harm to her health and wellbeing.

## VI.    CAUSES OF ACTION

### COUNT I

**Violation of 42 U.S.C. §§ 1396a(a)(8) & (a)(10)(A) of the Medicaid Act**

137.   Plaintiff incorporates and re-alleges paragraphs 1 through 136 as if fully set forth herein.

138.   Defendant's application of GAPP policies and practices to Plaintiff's request for private duty nursing services to ameliorate her complex conditions is arbitrary, capricious, and unreasonable and has denied Plaintiff her right to be provided medical assistance under EPSDT for which she is eligible in violation of 42 U.S.C. §§ 1396a(a)(8) & (a)(10)(A) of the Medicaid Act.

139.   Defendant's acts and omissions have denied Plaintiff her right to be furnished the EPSDT services to which she entitled in violation of 42 U.S.C. §§ 1396a(a)(8) & (a)(10)(A) of the Medicaid Act.

140.   Defendant's conduct is continuous and ongoing in violation of the Medicaid Act.

141.   Defendant has violated the Plaintiff's clearly established rights under 42 U.S.C. §§ 1396a(a)(8) & (a)(10)(A), which rights are enforceable by the Plaintiff pursuant to 42 U.S.C. § 1983.

142.   Defendant's conduct, under color of state law, has caused Plaintiff harm in the denial of necessary Medicaid services.

143.    Defendant's conduct, unless enjoined, will continue to inflict injuries on Plaintiff for which she has no adequate remedy at law.

## COUNT II

### Violations of the EPSDT provisions of the Medicaid Act

144.    Plaintiff incorporates and re-alleges paragraphs 1 through 136 as if fully set forth herein.

145.    In violation of the EPSDT provisions of the Medicaid Act, Defendant failed to decide Plaintiff's request for private duty nursing services in accordance with the "correct or ameliorate" standard and to provide Plaintiff with private duty nursing services in sufficient amount, duration, scope to achieve the ameliorative purpose of EPSDT in violations of 42 U.S.C. §§1396d(a)(4)(B), 1396a(a)(43)(C), and 1396d(r)(5) of the Medicaid Act;

146.    Defendant's application of GAPP policies and practices to Plaintiff's request for private duty nursing services to ameliorate her complex conditions is arbitrary, capricious, and unreasonable and has denied Plaintiff her right to be provided medical assistance under EPSDT to which she is entitled in violation of 42 U.S.C. §§1396d(a)(4)(B), 1396a(a)(43)(C), and 1396d(r)(5) of the Medicaid Act.

147. Defendant's conduct is continuous and ongoing in violation of the Medicaid Act.

148. Defendant has violated the Plaintiff's clearly established rights under 42 U.S.C. §§1396d(a)(4)(B), 1396a(a)(43)(C), and 1396d(r)(5), which rights are enforceable by the Plaintiff pursuant to 42 U.S.C. § 1983.

149. Defendant's conduct, under color of state law, has caused Plaintiff harm in the denial of necessary Medicaid services.

150. Defendant's conduct, unless enjoined, will continue to inflict injuries on Plaintiff for which she has no adequate remedy at law.

## COUNT III

### Violations of 42 U.S.C. § 1396a(a)(3) of the Medicaid Act

151. Plaintiff incorporates and re-alleges paragraphs 1through 136 as if fully set forth herein.

152. Defendant's written notice fails to provide a clear statement of the specific reasons supporting Defendant's reduction of Plaintiff's private duty nursing services under GAPP in violation of the 42 U.S.C. § 1396a(a)(3) and 42 C.F.R. §§ 431.206 & 431.210.

153. Defendant's conduct is continuous and ongoing in violation of the Medicaid Act.

154.   Defendant has violated the Plaintiff's clearly established right under 42 U.S.C. § 196a(a)(3), which rights are enforceable by the Plaintiff pursuant to 42 U.S.C. § 1983.

155.   Defendant's conduct, under color of state law, has caused Plaintiff harm in the denial of her statutory right to timely and adequate notice of Defendant's decision regarding Plaintiff's request for private duty nursing services.

156.   Defendant's conduct, unless enjoined, will continue to inflict injuries for which Plaintiff has no adequate remedy at law.

## COUNT IV

**Violation of the Fourteenth Amendment to the U.S. Constitution**

157.   Plaintiff incorporates and re-alleges paragraphs 1 through 136 as if fully set forth herein.

158.   Defendant's written notice fails to provide a clear statement of the legal and factual bases supporting Defendant's reduction of Plaintiff's private duty nursing services under GAPP in violation of Due Process Clause of the Fourteenth Amendment.

159.   Defendant failed to provide Plaintiff with timely and adequate written notice of his decision to reduce Plaintiff's private duty nursing services in violation of the Due Process Clause of the Fourteenth Amendment.

36

160.   Defendant's conduct is continuous and ongoing in violation of the Due Process Clause of the Fourteenth Amendment.

161.   Defendant has violated the Plaintiff's clearly established right to due process under the Due Process Clause of the Fourteenth Amendment, which right is enforceable by the Plaintiff pursuant to 42 U.S.C. § 1983.

162.   Defendant's conduct, under color of state law, has caused Plaintiff harm in the denial of her constitutional right to due process of law including timely and adequate written notice.

163.   Defendant's conduct, unless enjoined, will continue to inflict injuries for which Plaintiff has no adequate remedy at law.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

(a)   Assume jurisdiction of this matter;

(b)   Declare Defendant's review process for determining the amount of private duty nursing services to be authorized for Plaintiff minimizes the skilled care needs identified by Plaintiff's treating physicians and arbitrarily ignores the treating physicians' determination of the amount of private duty nursing services necessary to ameliorate Plaintiff's conditions in violation of 42 U.S.C. §§1396d(a)(4)(B), 1396a(a)(43)(C), and 1396d(r)(5) of the Medicaid Act;

(c)     Declare the Medicaid Act requires private duty nursing services be provided by licensed nurses and does not provide for the delegation of skilled nursing task that require the knowledge and skill of a licensed nurse to Plaintiff's family caregivers;

(d)     Declare that the determination of whether private duty nursing services are medically necessary for Plaintiff under the Medicaid Act must be based upon whether the services are necessary to correct or ameliorate Plaintiff's conditions, not on whether a family caregiver is trained to perform skilled nursing tasks for the Plaintiff;

(e)     Declare that Defendant's imposition of the "teach and wean" policy under which family caregivers are taught to perform skilled nursing tasks for the Plaintiff and the Plaintiff is then weaned from private duty nursing services violates Defendant's duty under 42 U.S.C. §§1396d(a)(4)(B), 1396a(a)(43)(C), and 1396d(r)(5) of the Medicaid Act to provide all necessary private duty nursing services to correct or ameliorate the Plaintiff's conditions;

(f)     Declare that Defendant's "teach and wean" policy requiring family caregivers to provide a portion of Plaintiff's medically necessary skilled care deprives Plaintiff of her entitlement to all necessary private duty nursing services to correct or ameliorate her conditions in violation of a violation of 42 U.S.C.

38

§§1396d(a)(4)(B), 1396a(a)(43)(C), and 1396d(r)(5) of the Medicaid Act;

(g)    Declare that Defendant's application of GAPP policies and practices to Plaintiff's request for private duty nursing services has denied, and continues to deny, Plaintiff the medical assistance for which she is eligible under the Medicaid Act in violation of 42 U.S.C. §§ 1396a(a)(8) & (a)(10)(A) of the Medicaid Act;

(h)    Declare Defendant's failure to provide timely and adequate written notice of his decision to reduce Plaintiff's private duty nursing services a violation of the Due Process Clause of the Fourteenth Amendment and of 42 U.S.C. § 1396a(a)(3) of the Medicaid Act;

(i)    Declare Defendant's denial of Plaintiff's private duty nursing services invalid because Defendant failed to provide Plaintiff with proper written notice of the denial under 42 C.F.R. § 431.210;

(j)    Issue preliminary and permanent injunctive relief enjoining Defendant from the following:

 1) Enjoin Defendant from reducing Plaintiff's private duty nursing services below 50 hours per week;

 2) Enjoin Defendant from failing to consider the recommendations of Plaintiff's treating physician for private duty nursing services;

 3) Enjoin Defendant from evaluating Plaintiff's requests for prior

authorization of private duty nursing services using a standard other than the "correct or ameliorate" standard prescribed by 42 U.S.C. § 1396d(r)(5).

4) Enjoin Defendant from applying policies to Plaintiff that require her family caregivers to provide daily skilled nursing care necessary to correct or ameliorate her conditions;

5) Enjoin Defendant from failing to provide Plaintiff with written notice of Defendant's decisions regarding prior authorization of private duty nursing services that provide a clear statement of the specific reasons for Defendant's decisions including a specific explanation why the amount of private duty nursing services requested by the treating physician are not necessary to correct or ameliorate her conditions;

6) Enjoin Defendant from failing to adopt a written policy that provides that all written notices provided to Plaintiff and her caregivers will comply with the requirements set forth in 42 C.F.R. § 431.210, including, but not limited to, a clear statement of the specific reasons supporting the denial or reduction of private duty nursing services and a clear statement of how the amount of private duty nursing

services approved is sufficient to ameliorate Plaintiff's conditions;

7) Enjoin Defendant from failing to publish and notify its third-party contractors of the policy regarding written notices of decision regarding Plaintiff's private duty nursing hours;

(k)    Enter judgment in favor of the Plaintiff;

(l)    Award Plaintiff the costs of this lawsuit and reasonable attorney's fees and expenses pursuant to 42 U.S.C. § 1988; and

(m)    Order such other and further relief as this Court may deem equitable and just.

Dated: November 11, 2023.

s/ Joshua H. Norris
Joshua H. Norris
Georgia Bar No. 545854
**LAW OFFICE OF JOSHUA H. NORRIS, LLC**
One West Court Square, Suite 750
Decatur, GA  30030
Telephone:  (404) 867-6188
Facsimile:  (404) 393-9680
E-mail:      josh.norris@childrenshealthlaw.org

and

John H. Fleming
Georgia Bar No. 263250
Anna C. Halsey
Georgia Bar No. 208034
Alla Raykin
Georgia Bar No. 291506

41

**EVERSHEDS SUTHERLAND (US) LLP**
999 Peachtree Street, NE, Suite 2300
Atlanta, Georgia  30309-3996
Telephone:   (404) 853-8000
Facsimile:   (404) 853-8806
E-mail: JohnFleming@Eversheds-Sutherland.com
   AnnaHalsey@Eversheds-Sutherland.com
   AllaRaykin@Eversheds-Sutherland.com

***Attorneys for Plaintiff***

## VERIFICATION

STATE OF GEORGIA        §
                        §
COUNTY OF FULTON        §

My name is Joshua Porter. I am the father and legal guardian of A.P. I have read the Verified Complaint for Injunctive and Declaratory Relief. The allegations of which I have personal knowledge stated in the Verified Complaint are true and correct. The allegations of which I do not have personal knowledge I believe to be true based on specified information, documents, or both.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11 day of November, 2023.

_____

JOSHUA PORTER